UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse 40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

# MOTION INFORMATION STATEMENT

**Docket Number(s):** 24-3325

Caption [use short title]

County of Rockland et al.

v.

Triborough Bridge & Tunnel Authority et al.

**Motion for:** Emergency Stay of Appellees' Congestion Pricing Program (pending appeal)

Set forth below precise, complete statement of relief sought:

A stay of Appellees' Congestion Pricing Program -- which is otherwise scheduled to take effect on 1/5/25 -- pending appeal of the district court's 12/23/24 denial denial of Plaintiffs/Appellants' motion for a preliminary injunction. Appellant also seeks an administrative stay pending adjudication of this motion.

**MOVING PARTY:** County of Rockland

☒ Plaintiff ☐ Defendant

☒ Appellant/Petitioner ☐ Appellee/Respondent

**OPPOSING PARTY:** TBTA and MTA

**MOVING ATTORNEY:** David H. Chen, Esq.

**OPPOSING ATTORNEY:** Roberta A. Kaplan, Esq.

[name of attorney, with firm, address, phone number and e-mail]

| | |
|---|---|
| Bleakley Platt & Schmidt, LLP | Kaplan Martin LLP |
| 1 North Lexington Ave. White Plains, NY 10601 | 156 West 56th Street, Suite 207 New York, NY 10019 |
| (914) 949-2700 dchen@bpslaw.com | (212) 316-9500 rkaplan@kaplanmartin.com |

Court- Judge/ Agency appealed from: SDNY (Seibel, J.)

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☒ Yes ☐ No (explain):

Opposing counsel's position on motion:
☐ Unopposed ☒ Opposed ☐ Don't Know

Does opposing counsel intend to file a response:
☒ Yes ☐ No ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below? ☒ Yes ☐ No

Has this relief been previously sought in this court? ☐ Yes ☒ No

Requested return date and explanation of emergency: 1/3/2025

Absent a stay, the Congestion Pricing Program will take effect on 1/5/2025. If Plaintiffs (or any of the plaintiffs in any of the various related actions) ultimately prevail on the merits, they will have suffered irreparable harm in the meantime as Defendants cannot realistically refund the estimated 700,000 charges per day.

Is the oral argument on motion requested? ☒ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set? ☐ Yes ☒ No If yes, enter date:

**Signature of Moving Attorney:** [signature]

**Date:** January 2, 2025

Service : ☒ Electronic ☒ Other [Attach proof of service]

**Form T-1080** (rev. 10-23)

## INTRODUCTION AND SUMMARY

Appellant the County of Rockland (hereafter "Rockland" or "the County") respectfully requests that this Court grant an emergency stay of the Triborough Bridge & Tunnel Authority's ("TBTA") and Metropolitan Transportation Authority's ("MTA") "Congestion Pricing" program—scheduled to take effect on Sunday, January 5, 2025—pending the appeal from the denial of Rockland's motion for a preliminary injunction. Because this denial will otherwise disrupt the status quo by allowing Congestion Pricing to take effect, Rockland also requests an immediate administrative stay while the Court considers this motion.

It is undisputed that New York Governor Kathy Hochul paused Congestion Pricing once already, for over half a year, with no objection from the TBTA or MTA. It is undisputed that Congestion Pricing will affect an estimated 700,000 drivers per day once it takes effect, charging them $9 (and eventually $15) to enter New York City's Central Business District ("CBD"). And it is undisputed that the Congestion Pricing program faces multiple legal challenges in federal and state courts. If just one of these legal challenges succeeds, the TBTA and MTA will face the unprecedented task of refunding all those individual charges, multiplied across every day that Congestion Pricing remains in effect. Any assurances that such massive refunding of both E-Z Pass and "toll-by-mail" charges can be seamlessly accomplished are questionable, to say the least.

Given the foregoing, the balance of equities and public interest weigh overwhelmingly in favor of preliminarily enjoining Congestion Pricing until the courts can fully adjudicate its legality. Yet in denying Rockland's preliminary injunction motion, the district court did not even attempt to weigh the competing equities or consider the public interest. The scope of the Congestion Pricing program is simply too large, and its overall impact too consequential, for it to be implemented without considering these factors.

In sum, particularly for the sake of those commuters who have no option but to drive and for whom $9 per day is simply more than they can afford, the Court should stay implementation of the Congestion Pricing program pending this appeal.

## STATEMENT

Appellees the Triborough Bridge & Tunnel Authority and the Metropolitan Transportation Authority are the defendants to the underlying action. Under their proposed Congestion Pricing program, drivers who enter New York City's CBD (generally, Manhattan south of 60th Street excluding the West Side Highway and FDR Drive) will be charged $9, increasing to $12 in 2028 and $15 in 2031.

Congestion Pricing charges will only be imposed once per day, but vehicles will be charged the full amount regardless of how long they spend or how far they drive within the CBD. Other than taxicabs, vehicles will not be charged for trips made wholly within the CBD. In other words, if a non-taxicab vehicle is garaged

and driven wholly within the CBD, it will never be charged under the Congestion Pricing program. Non-polluting vehicles are charged the same amount as gas-powered vehicles.

The Congestion Pricing program will give a $3 "crossing credit" to drivers entering Manhattan through the tolled Lincoln, Holland, Queens-Midtown and Brooklyn-Battery Tunnels, but no such crossing credit is being offered to drivers who commute via the heavily tolled George Washington or Tappan Zee Bridges. And while New York State will offer a Congestion Pricing tax credit to those residents of the CBD earning less than $60,000 per year, no such tax credit is being offered to anyone outside the CBD, regardless of their income.

The stated purposes of the Congestion Pricing program are to reduce traffic and pollution in lower Manhattan by deterring drivers from entering the CBD, and to raise revenue for Defendants. Per the MTA, 80% of that revenue will go to modernizing New York City's subways and buses, 10% will go to the Long Island Rail Road, and 10% will go to Metro-North Rail Road. The Long Island Rail Road does not service Rockland County, and while portions of two Metro-North lines do service Rockland, both lines are operated by NJ Transit Rail Operations and it is unclear if they will receive any Congestion Pricing funds.

Notably, no commuter rail line connects Rockland to any part of New York City (let alone the CBD) via a "one-seat" train ride. Commuting to the CBD from

Rockland via rail accordingly involves transferring in New Jersey and can take over two hours. Moreover, the commuter rail lines have extremely limited service to Rockland. For example, there are only six evening rush-hour outbound trains on the Port Jervis rail line, after which trains only run every two hours. This makes commuting to the CBD from Rockland by rail all but impossible for those working night shifts or overtime.

Rockland, together with the County Executive and County Legislature, filed the underlying action in March 2024. On June 5, 2024, Governor Hochul directed the MTA to indefinitely "pause" congestion pricing. The stated reason was "to avoid added burdens to working- and middle-class families."[1] On November 14, 2024—nine days after Election Day—Governor Hochul announced that the pause would end on January 5, 2025.

On December 6, 2024, Rockland moved the district court to preliminarily enjoin the Congestion Pricing program. Orange County made a similar motion in a related action before the same district court, and Putnam County filed an *amicus* brief in support of the requested injunction. On December 23, 2024, the district court issued an order from the bench denying the requested injunction. A true and correct copy of the transcript with this order is annexed hereto as Attachment 'A.'

---

[1] *See* NEW YORK STATE, "What They Are Saying" (June 5, 2024), *available at*: https://www.governor.ny.gov/news/what-they-are-saying-governor-hochul-announces-pause-congestion-pricing-address-rising-cost.

On December 30, 2024, a different district court issued an order in the State of New Jersey's separate lawsuit challenging the Congestion Pricing program. *See generally State of New Jersey v. United States Dep't of Transp. et al.*, No. 23-cv-3885 (LMG), 2024 WL 5247990 (D.N.J. Dec. 30, 2024). That order granted and denied in part the parties' cross-motions for summary judgment and remanded the matter to the Federal Highway Administration "until January 17, 2025 for the FHWA to take actions in conformity with this Opinion."

On December 31, 2024, New Jersey filed an emergency motion for an order temporarily restraining the implementation of Congestion Pricing, a hearing for which is scheduled for January 3, 2025.

## ARGUMENT

It is well-settled that the party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023). The denial of a preliminary injunction is reviewed for abuse of discretion, *see JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 99 (2d Cir. 2024), which occurs where a district court has "(1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3)

rendered a decision that cannot be located within the range of permissible decisions." *Id.* (citations and internal quotation marks omitted).

On the underlying appeal, Rockland will argue that the district court abused its discretion in denying the requested preliminary injunction. The instant motion simply seeks to stay implementation of Congestion Pricing until the appeal can be adjudicated. There are several important reasons to do so.

First and foremost, the balance of equities tips decisively in favor of a stay, which is also in the public interest.[2] It is undisputed that the implementation of Congestion Pricing was recently "paused" for over six months. Given the overlap of this pause with the 2024 election season, it would appear to have been motivated by political considerations. Regardless, nothing in the record suggests that either the TBTA or MTA opposed it, and they should accordingly not be heard to complain about an additional "pause," *i.e.*, the requested stay. Such a stay need only last as long as it takes the Court to hear the underlying appeal on an expedited schedule.

The TBTA and MTA will inevitably argue that any stay will prejudice them in the form of lost revenue. But this Court has held that where, as here, "a petitioner alleges constitutional violations, the balance of hardships tips decidedly in the petitioner's favor despite arguments that granting a preliminary injunction would

---

[2] The district court declined to consider Rockland's balance of the equities or public interest arguments. (*See* Attachment 'A' at 36.)

cause financial or administrative burdens on the Government." *Hernandez Aguilar v. Decker*, 482 F. Supp. 3d 139, 150 (S.D.N.Y. 2020) (citing *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984)).

Moreover, in opposing Rockland's preliminary injunction motion, the MTA represented that it "has a balanced budget through 2026," "enjoys strong access to credit," that its "bonds are rated with either 'Positive' or 'Stable' outlooks across major credit rating agencies," and that it "receives revenue from multiple sources other than the [Congestion Pricing] Program." It can clearly afford a brief stay to adjudicate the legality of said Program. There is no other prejudice—if Appellees ultimately prevail, they can impose their Congestion Pricing program as desired.

In contrast, denying the requested stay and allowing Congestion Pricing to take effect would be severely prejudicial to the hundreds of thousands of drivers per day who will be charged under the program. Nine more dollars per day, forty-five more dollars per week, and approximately two hundred more dollars per month or $2400/year is simply more than some can afford. *See Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 179 (S.D.N.Y. 2022) (finding that balance of equities and public interest both favored preliminary injunction and noting that "even a small price increase can make a significant difference").

The extra financial burden will be even more prejudicial to Rockland commuters, many of whom already pay over $6 to cross the Tappan Zee Bridge or

over $15 to cross the George Washington Bridge.[3] As noted, such commuters will not receive the "crossing credit" afforded to tunnel commuters, nor will they benefit from the income tax credit afforded to certain residents of Manhattan's CBD.

The MTA and MBTA will argue that the very purpose of their Congestion Pricing charges is to deter commuters from driving into the CBD. But while this makes sense in areas with robust public transportation infrastructure, it does not work in "transit deserts" such as Rockland County, where there are simply no reasonable alternatives to driving.

It may be that the MTA and MBTA have considered more equitable ways of implementing Congestion Pricing, *e.g.*, credits for Hudson River bridge crossings or expansion of light rail service. But the record is devoid of such details. Appellants simply do not know what alternatives were considered, how the most recent iteration of Congestion Pricing charges and credits were calculated, or whether Appellees intend to invest any of the revenue into capital projects that will benefit Rockland commuters.[4] The need to develop the record strongly militates in favor of a stay.

Also militating in favor of a stay is the recently issued decision from a New

[3] Bridge tolls at least go to the maintenance of said bridges, and thus directly benefit the tolled driver. Congestion Pricing charges, in contrast, go to New York City buses and subways, the LIRR, and Metro-North, and thus afford little if any benefit to Rockland commuters.

[4] It bears mentioning that Rockland (together with Dutchess, Orange, and Putnam Counties) was supposed to have a representative on the very MTA governing board that made these decisions, but this seat has remained unfilled since June 2023, corresponding with the period during which the Congestion Pricing program was apparently being finalized.

Jersey district court in another action challenging the legality of Congestion Pricing. In that action, the State of New Jersey challenged the final determination by the U.S. Department of Transportation's Federal Highway Administration regarding the environmental review process under the National Environmental Policy Act and the Clean Air Act for the establishment of the Program. *See State of New Jersey v. United States Dep't of Transp. et al.*, No. 23-cv-3885 (LMG), 2024 WL 5247990, at *1 (D.N.J. Dec. 30, 2024). Both the MBTA and MTA are parties to that action.

Earlier this week, the New Jersey district court granted in part and denied in part the parties' cross-motions for summary judgment, finding, *inter alia*, that "the lack of specificity as to mitigation for some communities warrants further explanation, and if appropriate, reconsideration," *id.* at *18, and "the FHWA and Project Sponsors acted in an arbitrary and capricious manner in reaching their mitigation determination in the Final [Environmental Assessment] and [Finding Of No Significant Impact]," *id.* at *21.

The New Jersey district court accordingly remanded the action to the Federal Highway Administration "until January 17, 2025 for the FHWA to take actions in conformity with this Opinion;" ordered New Jersey to "file its comments on the Remand Results on or before January 29, 2025;" and ordered the defendants (including the MBTA and MTA) to "file their respective response comments on or before February 11, 2025." *Id.* at *30. A stay of Congestion Pricing will allow these

deadlines to be met.[5]

In opposing the underlying motion, the MBTA and MTA argued that there is no risk of irreparable harm because if Congestion Pricing is ultimately defeated, any charges imposed under the program can simply be refunded. The district court agreed, finding it "feasible for them to refund toll payers … either by crediting E-Z Pass accounts, reversing credit charges, or issuing a refund check." (Attachment 'A' at 34.)

It may be theoretically feasible, but given the sheer number of Congestion Pricing charges that would have to be refunded (by Appellees' own estimates, roughly 700,000 for every day the program is in place), the likelihood of this actually occurring—in a timely and accurate manner—is extraordinarily low. It is inevitable that at least some drivers would not receive refunds worth potentially hundreds of dollars. Surely it makes more sense to resolve the pending litigation first rather than create such an unnecessary and consequential risk.

Finally, although a full examination of the merits of Rockland's claims must await the underlying appeal, the Court should note that these claims raise constitutional concerns. Rockland's first claim sounds in the Equal Protection

---

[5] Notably, on December 31, 2024, New Jersey filed an emergency motion requesting that the district court temporarily restrain Congestion Pricing from taking effect. A hearing on New Jersey's emergency motion is scheduled for Friday, January 3, 2025 at 3 p.m. according to the district court docket (No. 23-cv-3885 (LMG)).

Clause of the United States and New York State constitutions and asks whether there is a rational relationship between the Congestion Pricing program and its stated objectives. As noted, Congestion Pricing: 1) charges vehicles only for entry to the CBD; 2) gives "crossing" credits for the lower Manhattan tunnels but not the Hudson River bridges; 3) does not distinguish between electric and gas vehicles; and 4) grants income-based tax credits to certain residents of Manhattan's CBD only.

A rational program would charge based on the amount of time a driver spends in the CBD and/or the distance driven within the CBD. By instead charging drivers only upon entry to the CBD, Congestion Pricing does nothing to disincentivize the driver of a car garaged in the CBD from driving within the CBD as often as possible. And a rational program whose objective was to reduce pollution would distinguish between vehicles that emit exhaust and vehicles that do not. Indeed, to the extent drivers are simply re-routed by Congestion Pricing, the overall amount of pollution is not decreased—the pollution is simply diverted to other locations.

Rockland's second claim alleges that Congestion Pricing's $9 (soon to be $15) per day charge violates the Eighth Amendment in that it is overly punitive and disproportionate to the activity it is trying to deter (simply driving into the CBD). Not only is it excessive; such a charge makes no allowance for drivers with no other option or for drivers who enter the CBD accidentally.

Rockland's third claim is based upon the fact that the TBTA and the MTA are

statutorily authorized to impose tolls but not taxes, and Congestion Pricing is actually the latter. Tolls are "the consideration given for the use of roads, bridges, ferries, or similar things of a public nature." BLACK'S LAW DICTIONARY (3d ed. 1991). A tax, in contrast, is "money assessed on a person or property for the support of the government." *Id.* Congestion Pricing cannot be consideration for a driver's "use" of the CBD streets, because it will not be imposed for the numerous trips conducted solely within the CBD. Moreover, Congestion Pricing will not maintain the CBD streets; it is intended to fund the TBTA and MTA, both of which are governmental entities. It is a tax in all but name.

## CONCLUSION

The Congestion Pricing program should be stayed pending Rockland County's underlying appeal. And because Congestion Pricing's January 5, 2025 implementation would disrupt the status quo, Rockland County also requests an administrative stay while the Court considers this motion.

Respectfully submitted,

BLEAKLEY PLATT & SCHMIDT, LLP
One North Lexington Avenue
White Plains, NY 10601
*Co-Counsel for Appellants*

by: /s/ ***David H. Chen***
David H. Chen, Esq.
dchen@bpslaw.com

Matthew G. Parisi, Esq.
mparisi@bpslaw.com

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2,854 words (including footnotes).

This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Time New Roman 14-point font, a proportionally spaced typeface.

/s/ *David H. Chen*
David H. Chen

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2025, I electronically filed the foregoing motion with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system, and e-mailed a copy of the motion papers to all counsel of record in the underlying action at their e-mail addresses of record.

/s/ *David H. Chen*
David H. Chen

# ATTACHMENT 'A'

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
COUNTY of ROCKLAND and EDWIN J. DAY, in his official capacity as County Executive,
Plaintiffs,

-against- 24 CV 2285 (CS)

TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY and METROPOLITAN TRANSPORTATION AUTHORITY,
Defendants.
-----------------------------------x
STEVEN M. NEUHAUS, Individually, and in his official capacity as County Executive and COUNTY OF ORANGE,
Plaintiffs,

-against- 24 CV 3983 (CS)

TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY and METROPOLITAN TRANSPORTATION AUTHORITY,
Defendants.
-----------------------------------x
United States Courthouse
White Plains, New York
December 23, 2024

B e f o r e: THE HONORABLE CATHY SEIBEL,
District Judge

A P P E A R A N C E S:

BLEAKLEY PLATT & SCHMIDT, LLP
Attorneys for County of Rockland
MATTHEW PARISI
DAVID CHEN
-and-
THOMAS HUMBACH, County Attorney, County of Rockland

ORANGE COUNTY DEPARTMENT of LAW
Attorneys for County of Orange
WILLIAM BADURA

KAPLAN MARTIN
Attorneys for TBTA and MTA
MAXIMILIAN CREMA
-and-
SIVE PAGET RIESEL PC
Attorneys for TBTA and MTA
DANE WARREN

THE CLERK: All rise. The Honorable Cathy Seibel presiding.

County of Rockland v Triborough Bridge and Tunnel

THE COURT: Good afternoon. Everyone can have a seat.

MR. PARISI: Good afternoon.

THE COURT: Let me make sure I know who's who.

Let's *see*. Who's here for County of Rockland? Mr. Chen.

MR. CHEN: Yes, your Honor. Good afternoon.

THE COURT: Nice to see you.

MR. CHEN: You too.

THE COURT: And Mr. Warren; is that right? No, that's not right.

Mr. Parisi.

MR. PARISI: Yes. Good afternoon.

THE COURT: Good afternoon.

And then for Orange, Mr. Humbach.

MR. HUMBACH: Thomas Humbach for County of Rockland, County Attorney.

THE COURT: I'm sorry. Three of you for Rockland; Mr. Chen, Mr. Parisi, Mr. Humbach for Rockland.

Who's here for County of Orange?

MR. BADURA: William Badura, your Honor.

THE COURT: Good afternoon.

MR. BADURA: Good afternoon, Judge.

THE COURT: And for defendants, Mr. Crema. Am I saying it right?

MR. CREMA: That's right, your Honor. Good afternoon.

THE COURT: And Mr. Warren.

MR. WARREN: Good afternoon, your Honor.

THE COURT: Good afternoon.

I'm prepared to rule on the motions.

Does anyone have anything they want to add not covered by the papers?

All right, I'll take that as a no.

I have before me motions for a preliminary injunction by plaintiffs in two related cases: The first is County of Rockland versus Triborough Bridge and Tunnel Authority, Number 24CV2285; and the other is Neuhaus versus Triborough Bridge and Tunnel Authority, 24CV3983.

Neuhaus, Mr. Neuhaus is the county executive of Orange County. The County is the co-plaintiff. I'm going to refer to both of them collectively as Orange.

The County of Rockland's co-plaintiffs are County Executive Edwin Day, and the County Legislature, and I'm going to refer to them collectively as Rockland.

And the defendants in both actions are the Triborough Bridge and Tunnel Authority, or TBTA, and Metropolitan

Transportation Authority, or MTA. Both sets of plaintiffs are moving for a preliminary injunction enjoining implementation of the Central Business District Tolling Program, commonly known as congestion pricing. I'm going to call it either the Program or Congestion Pricing.

I assume the parties' familiarity with the Program, or one could refer to Judge Liman's decision of earlier today for a detailed description of it in *Chan v. US Department of Transportation*, 23CV10365, and related cases.

On March 26, 2024, Rockland filed its original complaint, alleging that the Program violates the Equal Protection Clause of the New York and US Constitutions; is an unauthorized tax; and violates the Eighth Amendment prohibition against excessive punishments. The original complaint is found in ECF number 2 on the Rockland docket. Rockland also labeled as a cause of action a request that defendants be enjoined to conduct a study of a possible bridge offset for Rockland residents, but that request was untethered to any recognizable cause of action, and in any event, I do not discuss it further as it is well settled that an injunction is a remedy, not a cause of action. *Spectre Air v. WWTAI*, 2024 WL 3030404, at *9 (S.D.N.Y. June 17, 2024).

By the way, unless I indicate otherwise, any case quotations today omit internal quotation marks, citations, alterations, and footnotes.

On May 13th of this year, Rockland filed an amended complaint asserting the same causes of action. That can be found in ECF number 9 on the Rockland docket. On May 23rd, 2024, Orange filed its complaint alleging that the Program violates the right to travel, violates the Equal Protection and Due Process Clauses of the state and federal constitutions, and is an unauthorized tax. Orange's complaint can be found at ECF number 7 on the Orange docket.

On May 30th, the Court designated the cases as related.

On September 30th, defendants filed a pre-motion letter in anticipation of their motion to dismiss both complaints. At the October 29th pre-motion conference, I ordered the parties to submit a proposed schedule for filing amended complaints and briefing the motions to dismiss in light of the government's pause on the Program at that time. On November 6th, I adopted plaintiff's proposed schedule, postponing the amendments to the pleadings and the briefings on the motions to dismiss until after the pause was lifted. On November 18th, after the lifting of the pause had been announced on November 14th, I directed that if either plaintiff was planning to seek a preliminary injunction, the parties should confer and propose on a schedule that would allow me to rule before the December holidays. On November 26th, the parties filed the proposed schedule, which I approved, and the

instant motions followed.

Turning now to the legal standard. Generally speaking, "to obtain a preliminary injunction, plaintiffs must show: One, the likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping decidedly in the plaintiffs' favor; two, that they are likely to suffer irreparable injury in the absence of an injunction; three, that the balance of hardships tips in their favor, and, four, that the public interest would not be disserved by the issuance of a preliminary injunction." *Mendez v Banks*, 65 F.4th, 56, 63-64.

Sometimes the Circuit frames the test as having three parts: "In order to justify a preliminary injunction, a movant must demonstrate: One, irreparable harm absent injunctive relief; two, either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial with a balance of hardships tipping decidedly in the plaintiff's favor; and, three, that the public's interest weighs in favor of granting an injunction." *Spanski Enterprises v. Telewizja Polska*, 832 F.App'x 723, 724, which is a summary order. Either way, a preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24.

But "the serious-questions standard cannot be used to

preliminarily enjoin governmental action." *Trump v. Deutsche Bank*, 943 F.3d 627, 637, vacated and remanded on other grounds, 591, 848. At least "where the full play of the democratic process involving both the legislative and executive branches has produced a policy in the name of the public interest embodied in a statute and implementing regulations." The first quote is from *Trump* at 637, and the latter quote from *Trump* at 638. As explained by the Circuit in that case, the Second Circuit has "ruled that the more rigorous likelihood-of-success standard was applicable when a preliminary injunction was sought to prohibit a municipal agency from enforcing a regulation, see *Central Rabbinical Congress v. New York City*, 763 F.3d 183, 192, to prohibit New York City's Taxi & Limousine Commission from enforcing changes to lease rates, *Metropolitan Taxicab Board of Trade v. City of New York*, 615 F.3d 152, 156; to require one branch of the state legislature to undo its expulsion of a state senator, *see Monserrate v. New York State Senate*, 599 F.3d 148, 154; to prohibit a town from hiring police officers and firefighters, *see NAACP v. Town of East Haven*, 70 F.3d 219, 223; to prohibit the Metropolitan Transportation Authority from implementing a staff reduction plan, *see Molloy v. MTA*, 94 F.3d 808, 811; to prohibit the New York City Transit Authority from increasing subway and bus fares, *see New York Urban League v. State of New York*; to prohibit New York State's Department of Social Services from

suspending a healthcare services provider from participating in the State's medical assistance program, *see Plaza Health Laboratories v. Perales*, 878 F.2d 577, 580; and to prohibit two commissioners of New York State agencies from enforcing provisions of state law, *see Medical Society v. Toia*, 560, F.2d, 535, 538."

That's a long quote from the *Trump* case at 639.

So the serious question standard does not apply here. Plaintiffs have to meet the likelihood of success on the merits standard.

Courts in this circuit "routinely consider hearsay evidence in determining whether to grant preliminary injunctive relief, including affidavits, depositions, and sworn testimony." *725 Eatery v. City of New York*, 408 F.Supp. 3d 424, 455 (S.D.N.Y. 2019). While determining whether to award injunctive relief involves less formal procedures and less complete evidence than trial, "motions for a preliminary injunction should not be resolved on the basis of affidavits that evince disputed issues of fact." Here, however, neither side has sought an evidentiary hearing and I find one is not necessary, as my decision does not turn on disputed facts. *See Maryland Casualty v. Realty Advisory Board*, 107 F.3d 979, 984, where the circuit said a district court is not required to conduct an evidentiary hearing on a preliminary injunction motion when the essential facts are not in dispute; and *Clark*

*v. Childs*, 416 F.Supp. 3d 221, 222 (E.D.N.Y. 2017), which points out that evidentiary hearings on motions for preliminary injunctions are not required.

I turn first to likelihood of success on the merits.

As an initial matter, defendants argue that I should apply the more heightened standard of clear or substantial likelihood of success on the merits. Because plaintiffs seek a mandatory, as opposed to a prohibitory, injunction. That's in the defendants' opposition brief, which is found at ECF number 46 on the Rockland docket at pages 8-9. Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it. *North American Soccer League v. United States Soccer Federation*, 883 F.3d 32, 36. "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing a clear or substantial likelihood of the success on the merits." *North American Soccer* at 37.

I agree with Rockland that the injunction they seek is a prohibitory injunction. See Rockland's Brief, ECF number 44 at page 7. Plaintiffs seek only to maintain the status quo pending resolution of the case, *see Cacchillo v. Insmed*, 638 F.3d 401, 406, by enjoining defendants from implementing their novel congestion pricing program. *See Gazzola v. Hochul*, 645 F.Supp. 3d 37, 50-51 (N.D.N.Y. 2022), which pointed out that to the extent plaintiffs sought to prevent regulations from going

into effect, they were seeking a prohibitory injunction maintaining the status quo, but had to meet the higher clear or substantial likelihood-of-success standard for mandatory injunction to the extent they were seeking to alter the status quo by stopping enforcement of regulations already in effect, and that was affirmed at 88 F.4th 186, and cert was denied at 144 Supreme Court 2659. That defendants may incur substantial costs if I grant a preliminary injunction does not transform the injunction from prohibitory to mandatory. So plaintiffs need not meet the heightened standard.

I now turn to whether they have shown plain old likelihood of success on the merits, and I'll start with the right to travel claim. "Courts have long recognized that the Constitution protects a right to travel within the United States, including for purely intrastate travel." *Selevan v. New York Thruway Authority*, 711 F.3d 253, 257 (Second Circuit 2013), collecting cases. "A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective or when it uses any classification which serves to penalize the exercise of that right." *Angus Partners v. Walder*, 52 F.Supp. 3d 546, 559. (S.D.N.Y., 2014). "Although strict scrutiny will apply to denials of the fundamental right to travel, minor restrictions on travel simply do not amount to the denial of a fundamental right." That's *Angus Partners* at 559. *See Jeffery v. City of*

*New York*, 113 F.4th 176, 191, collecting cases. In such circumstances, a district court will apply the three-part standard set forth by the Supreme Court in *Northwest Airlines v. County of Kent*, 510 U.S. 355, *Angus Partners* at 559-560.

Although Orange conceded in its letter reply to defendants' pre-motion letter that the congestion pricing toll is subject to the lesser *Northwest Airlines* standard, see ECF number 25 on the Orange docket, page 2, it now argues that the toll is subject to strict scrutiny, see Orange's brief, which is on its docket at ECF number 39 at pages 8-9. I disagree. Courts in this circuit have uniformly held that tolls are only minor restrictions on travel that do not invoke strict scrutiny. *See Janes v. TBTA*, 977 F.Supp. 2d, 320, 334 (S.D.N.Y. 2013), which said, "In every case of this type, courts have held that a differential toll policy does not violate the right to travel," *aff'd* 774 F.3d 1052; *see also Weisshaus v. Port Authority*, 497 F.App'x 102, 104. The summary order affirming dismissal of a right to travel claim challenging Port Authority tolls; and *Selevan*, 711 F.3d 258-259, applying the *Northwest Airlines* test to a bridge toll policy. Orange does not explain why these authorities should not apply here. Instead, they argue that I should apply strict scrutiny because a primary objective of the tolling program is to impede travel into the central business district, or CBD. That's in Orange's memo at page 9. But as defendants correctly

observe in their opposition at pages 11-12, the Program does not impede or primarily seek to impede travel into the CBD; rather, it seeks to affect the mode of transportation that people use when they travel. "Travelers do not have a constitutional right to the most convenient form of travel." *Weisshaus* 497 F.App'x at 104, so "burdens on a single mode of transportation" as here "do not implicate the right to...travel," *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 54. That plaintiffs do not have a one-seat public transit option into Manhattan is not relevant where plaintiffs have conceded that alternate methods of travel exist. *See Doe v. US Secretary of Transportation*, 2018 WL 6411277, at *10 (S.D.N.Y. December 4, 2018), which said "There are any number of conditions that might make particular forms of travel more difficult for some people than for others...but avoiding the inconvenience associated with finding alternative ways to travel does not rise to the level of a fundamental constitutional right." Accordingly, I decline to apply strict scrutiny to the Program and will instead apply the three-part test set forth in *Northwest Airlines*. Under that test, "the constitutional permissibility of fees charged for the use of state facilities is evaluated under a three-part test, which asks whether the fee: One, is based on some fair approximation of use of the facilities; two, is not excessive in relation to the benefits conferred; and, three, does not discriminate

against interstate commerce." *Selevan* at 259.

Orange did not brief this issue because it argued that strict scrutiny should apply despite defendants having argued in their pre-motion letter that that was the wrong test. Nor did Orange file a reply brief, again forfeiting an opportunity to respond to defendants' arguments regarding the *Northwest Airlines* test. They have thus implicitly conceded that the Program passes that test or at least abandoned any argument to the contrary. *See Emanuel v. City of New York*, 2024 WL 3638328, at *4 (S.D.N.Y. August 2, 2024). In an excess of caution, however, I will address the *Northwest Airlines* test.

Under the first factor, to determine whether the Program is based on some fair approximation of use of the facilities, courts consider whether the policy at issue reflects rational distinctions among different classes of motorists. *Selevan* at 259. "It does not require a perfect fit; it simply requires reasonableness." That's *Janes*, 977 F.Supp. 2d at 339. The stated purposes of the congestion pricing program include reducing congestion and pollution in the CBD, and raising revenue for the MTA's mass transit projects, as set forth in section 1701 of the New York Vehicle and Traffic Law. Under the Program, the peek period E-ZPass entry toll is $9 for passenger vehicles, $4.50 for motorcycles, $14.40 or $21.60 for larger vehicles, including transit and

commuter buses and trucks, depending on the size, and .75 per trip for taxis and $1.50 per trip for for-hire vehicles. See the de Cerreño declaration, which is found on the Rockland docket at ECF number 47. It's on the Orange docket as well. And that's in paragraph 7 of the declaration. The Program's distinctions are reasonable. It is rational for defendants to charge larger vehicles more than smaller vehicles because the former contribute more to congestion due to their size. It also makes sense to charge per trip for taxis and for-hire vehicles, rather than charging them each time they enter the CBD, as taxi drivers are already struggling; they sometimes enter the CBD without a passenger, they already pay a surcharge on trips south of 96th Street, and they pass the congestion pricing charge on to their customers who, after all, are the ones who make the choice to use a cab in the CBD. See the November 2023 Traffic Mobility Review Board report, which can be found at https://new.mta.info/document/127761. And for the reasons I will explain in my discussion of the equal protection and due process claims, I also find it rational for defendants to distinguish between motorists who enter the CBD from outside and those who only drive within it.

In their letter reply to defendants' premotion letter, although not in their briefing, Orange contended that the fair approximation requirement is not met because the toll proceeds will go to funding mass transit, not to maintaining

roads in the CBD. See ECF number 25 on the Orange docket at page 2. I disagree. "While the use of the [roads] might be one rational basis upon which to draw distinctions among different classes of motorists, it need not be the only one." *Selevan* at 259, n.5. Given that traffic flow in the CBD "would suffer significantly without the MTA's mass transit and commuter railway services, it is not unfair for the MTA to allocate [funds] to support these functionally related facilities." *Angus Partners* at 568. An Orange County commuter who chooses to drive to the CBD will benefit from less congested roads on the way to and in the CBD, and one who chooses to go by public transportation will benefit from an improved MTA.

I therefore find that the toll is based on some fair approximation of use of the facilities.

Turning now to the second factor, "under the excessiveness prong, the tolls collected may not exceed proper margins when taking into consideration the benefits conferred." *Angus Partners* at 568-69. "Again, the standard simply requires reasonableness." Same case at 569. Courts have recognized the myriad benefits that come from investing in mass transit systems, including "attracting industry; attracting and retaining a talented workforce; attaining economic productivity; and providing redundancy and resilience for the region in the event of disasters and crises." *Janes* at 340-41.

There are also undisputed benefits that flows from reduced congestion, including cleaner air and shorter travel times.

"The Second Circuit has held, as to this prong, that there must be a functional relationship between a fee or toll and those who pay it." *Janes* at 341. That relationship exists here. Orange and Rockland residents who drive into the CBD will benefit directly from the shorter communicate times anticipated to result from fewer cars on the road because of the toll. The fact that some of the benefits that flow from the toll will be available not only to toll payers but also others who use the MTA's transit systems "is not itself evidence that the [toll payers do] not benefit reasonably." *Angus Partners* at 570. "The benefits that flow to noncustomers do not diminish the benefits received by those who pay the TBTA tolls." *Angus Partners* at 570. Accordingly, the toll satisfies the excessiveness prong.

Turning now to the third factor.

"A state regulation discriminates against interstate commerce only if it imposes commercial barriers or discriminates against an article of commerce by reason of its origin or destination out of state." *Angus Partners* at 560-61. "To establish that a regulation or fee is discriminatory, a plaintiff must identify an in-state commercial interest that is favored directly or indirectly by the challenged statutes at the expense of out-of-state competitors." *Angus Partners* at

561. "The Court must direct its inquiry to determining whether the policy is basically a protectionist measure or where it can fairly be viewed as a policy directed to legitimate local concerns with effects upon interstate commerce that are only incidental." *Angus Partners* at 561.

On this record, there is no indication that the Program discriminates against interstate commerce. All vehicles entering the CBD must pay the applicable toll rate, regardless of whether they originate in-state or out-of-state. "To be sure that in-state residents are disadvantaged by the policies along with outsiders does not foreclose the finding of discrimination against interstate commerce but it supplies a valuable gauge of the Program's overall effect and strongly undermines any claim that they are driven by economic protections." *Janes* at 338. That the Program provides a low-income tax credit for CBD residents does not change my conclusions. Defendants have a "legitimate local concern" in reducing the toll burden on drivers who, by virtue of where they live, will have to pay the toll every time they return home from outside the CBD. And that "legitimate local concern" comes from *Angus Partners* at 561*; see Janes* at 338-339, which noted that the differential toll policies do not discriminate against interstate commerce where "the benign purpose underlying the challenged policies is apparent."

Rockland notes, in a different context, that the

Program offers a credit to drivers entering the CBD via one of the four downtown tunnels, but does not offer a credit to those who use the Hudson River bridges. That's in their brief at *2. But the reasonable distinction is that the tunnels, which are already tolled, lead directly into the CBD and the bridges do not. Moreover, the Program treats the Hudson River bridges, one of which originates in New Jersey, the same as the East River bridges, which are wholly in New York.

I thus find that the Program does not discriminate against interstate commerce.

Accordingly, the Program satisfies the *Northwest Airlines* test and Orange has not shown likelihood of success on the merits on its right to travel claim.

Turning now to equal protection and due process.

Both the US and New York Constitutions have equal protection guarantees. The analysis is the same under both as they are coextensive. *See Piechowicz v. Lancaster Central School District*, 2022 WL 22782841, at *18 (W.D.N.Y. January 18, 2022), report and recommendation adopted, 2022 WL 17540648 (December 8, 2022). "If a law neither burdens a fundamental right nor targets a suspect class, courts will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Roamer v. Evans*, 517 U.S. 620, 631. As plaintiffs rightly concede in their motion papers, the Rockland brief at pages 9-10, and the Orange brief

at pages 9-10, their equal protection claims are subject to rational basis of review. Under such review, a plaintiff must allege and show that the Program is "not rationally related to a legitimate government interest." *Tanov v. INS*, 443 F.3d 195, 201*; see Beatie v. City of New York*, 123 F.3d 707, 711, where the Circuit said "Legislative acts that do not interfere with fundamental rights or single out suspect classifications carry with them a strong presumption of constitutionality and must be upheld if rationally related to a legitimate state interest." Courts are required to uphold the classification "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Sensational Smiles v. Mullen*, 793 F.3d 281, 284, quoting *Heller v. Doe*, 509 US 312, 320. Plaintiff's therefore carry a "heavy burden to negative every conceivable basis which might support the defendants' policies." *Winston v. City of Syracuse*, 887 F.3d 553, 560.

Orange also asserts due process claims under the US and New York constitutions, but does not make any argument distinct from its equal protection claims. In any event, the analysis with respect to due process and equal protection is the same because the Program does not implicate the fundamental right. In that case, as with equal protection claims that do not indicate the suspect class, courts "apply rational basis review and the governmental regulation need only be reasonably related to a legitimate state objective." *Goe v. Zucker*, 43

F.4th 19, 30, cert denied, 143 Supreme Court 1020*; see Oneida Indian Nation of New York v. Madison County*, 665 F.3d 408, 427 n.13, which recognized that New York courts have interpreted the due process guarantees of the New York and US Constitutions to be coextensive, or have assumed that they are, but not deciding whether due process provides greater protection because the plaintiff there did not so assert. Nor did the plaintiffs here.

Rockland concedes that the Program's stated purposes, which include reducing congestion and pollution in the CBD and raising revenue for the MTA's mass transit projects, see VTL Section 1701, are legitimate government interests, Rockland's brief at 10, and I am satisfied that that requirement is met. *See Retail Properties v. Nassau County*, 2024 WL 4664644, at *12 (E.D.N.Y. August 21, 2024), which said "courts have found that revenue generation is a rational and legitimate government goal"; and *Algarin v. New York City Health & Hospitals*, 678 F.Supp. 3d 497, 517 (S.D.N.Y. 2023), which said that protecting public health and safety is also a legitimate government interest, *aff'd* 2024 WL 1107481. Relying on a recent Blue-Ribbon Report on MTA fare and toll evasion, Orange argues that "the MTA's need for additional revenue is dubious given its notorious inability to get its own financial house in order." That's in Orange's brief at page 10. Orange asserts that "seeking revenue from the tolling program cannot be viewed

as serving a legitimate purpose when such documented malfeasance and squandering of resource exists." That's from page 11. I fail to see how the MTA's losses delegitimize its goal of raising revenue. That the MTA could raise revenue by a different method, such as by improving its current fare and toll collection rates, is not a proper consideration for rational basis review. *See Doe v. Franklin Square Union Free School District*, 568 F.Supp. 3d 270, 292 (E.D.N.Y. 2021), which said "the Supreme Court has emphasized that application of rational basis review is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." I thus find that the Program's stated purposes are legitimate government interests.

The Program plainly advances those legitimate interests by charging vehicles that enter the CBD. The toll will likely deter some travelers from driving into the CBD, thereby reducing traffic congestion and pollution. And defendants will collect revenue from those who continue driving into the CBD, which they will use to advance their mass transit projects. Plaintiffs argue that there is no rational basis for charging motorists for entering the CBD while not charging motorists for driving only within the CBD. That's in Rockland's brief at 11 and Orange's at 10. As an initial matter, the Program will charge certain vehicles for driving within the CBD under the toll rate schedule, taxis and for-hire

vehicles, which defendants contend represent a significant percentage of overall vehicle traffic, will be charged for each trip they make, regardless from whether it originates inside or outside the CBD. See defendants' opposition at 13, and the de Cerreño declaration at paragraph 7. But in any event, it simply cannot be said that it is irrational to charge vehicles only when they enter the CBD. Plaintiffs have not suggested any practical means by which defendants could charge motorists other than cabs who drive only within the CBD, and it is obviously easier to charge a fee at the entrance to an area rather than attempting to track down people within that area. In other words, since regular motorists don't charge by the fare, there's no practical way to charge them when they're operating only within the CBD. As defendants point out in their opposition at pages 13-14, charging at the entrance is familiar to drivers and easier to administer. But even if there were a practical way to impose the charge on vehicles traveling only within the CBD, other than cabs or for-hire vehicles, that tighter regulations or more precise classifications could be crafted does not render the soon-to-be implemented regulations irrational. *See Nguyen v. INS*, 533 US 53, 77, and Justice O'Connor's dissent where she says, the fact that other means are better suited to the achievement of governmental ends...is of no moment under rational basis review," and *Spina v. DHS*, 470 F.3d 116, 131, which said "we

need not consider whether Congress might have employed more precise language or other classifications better to achieve its goal."

Rockland's other arguments likewise raise improper policy disagreements. For example, Rockland contends that the Program is not rationally related to reducing pollution because it does not distinguish between gas and electric vehicles. That's in their brief at page 11. Again, I need not consider whether defendants might have employed different classifications to accomplish their goals. *See Spina* at 131. And, in any event, there is a rational explanation for failing to distinguish between gas and electric vehicles, and it is that electric vehicles also contribute to congestion, the reduction of which is one of the legitimate goals in the Program. "Rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices, nor does it authorize the judiciary to sit as a super-legislature to judge the wisdom or desirability of the legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Heller v. Doe*, 509 U.S. at 319. Under this standard, plaintiffs have not shown likelihood of success on the merits as to their equal protection and due process claims.

Both sets of plaintiffs also argue that the congestion pricing toll is an unauthorized tax.

"Only legislative bodies have the power to impose taxes." *Walton v. New York State Department of Correctional Services*, 13 N.Y.3d 475, 485, citing Article III section 1 of the New York Constitution; *see WG Woodmere v. Nassau County*, 218 New York Supp 3d 627, 630 (Second Department 2024). The power to tax may not be delegated to administrative agencies or other governmental departments. *Greater Poughkeepsie Library District v. Town of Poughkeepsie*, 81 N.Y.2d 574, 580. Tolls, on the other hand, may be prescribed by the legislature, but ordinarily they are set by boards appointed for that purpose. *Carey Transportation v. TBTA,* 38 N.Y.2d 545, 556, Justice Cooke concurring.

The New York Legislature authorized the TBTA to "establish the central business district tolling program," see section 1704, sub section 1 of the VTL, and to "charge variable tolls and fees for vehicles entering or remaining in the central business district at any time." That's in section 1704-a(1). The toll rates for congestion pricing were thereafter adopted by the TBTA board. See paragraphs 4 through 6 of the de Cerreño declaration. Plaintiffs argue that the Program created pursuant to this authority imposes a tax rather than a toll, because it funds mass-transit projects that do not benefit the motorists and that because neither the TBTA nor the MTA have the authority to impose the tax, the Program is unlawful. See the Rockland memorandum at 13-14 and the Orange

memorandum at 11-12.

Way back in 1849 the Supreme Court said, "There is an essential difference between a toll and a tax. Tax...has...come to mean the charge which the government exacts of its citizens for its support. The tax is public, a toll private. A toll rests upon a good consideration. A tax is irrespective of consideration; it rests upon the authority of government alone." *Smith v. Turner*, 48 US 283, 344. More recent decisions agree. "A tax is a charge that a government exacts from a citizen to defray the general cost of government unrelated to any particular benefit received by that citizen." *Walton*, 13 N.Y.3d at 485. "Tolls are the compensation for the use of another's property or of improvements made by him." *Carey Transportation*, 38 N.Y.2d 566, Cooke concurring, and quoting *Sands v. Manistee River*, 123 U.S. 288, 294.

I need not determine whether the legislature improperly delegated taxing power to defendants because I find that the charge is a toll, not a tax. It plainly is not exacted of all citizens but only as consideration for entering the CBD, and it does not support general government, but only mass transit.

Nor does it matter that mass transit rather than the physical roads within the CBD will benefit. It is not necessary that "tolls must bear some relation to the physical use of defendants' physical facilities." *Carey Transportation*

at 554. In other words, a toll does not become a tax merely because the charge does not "represent only an allocation of a cost of construction, maintenance, and repair of the physical facilities." *Carey* at 550. Rather, a charge is a toll if it represents compensation for improvements made. *Carey* at 556, Cooke concurring. Here, the revenue from the toll will fund mass transit projects, and although plaintiffs argue that they will not benefit from those projects, that's in Rockland's brief at 13-14 and Orange's at 11-12, it is well-settled that mass transit benefits all commuters. *See Janes* at 341, which said "The benefit [of mass transit] is enjoyed especially by commuters to and from locations where mass transit options also exist, providing an alternative option to those particular arteries for commuters and thus decreasing the traffic thereon," and *Angus Partners* 567-68, which said "The MTA-operated transportation network provides motorists with transportation options and serves to reduce congestion on bridges and tunnels throughout the City. Indeed, usage of MTA mass transportation and commuter rail services influences TBTA facilities to such an extent that closures in parts of the system could result in rush-hour congestion levels in both directions all day and night on certain TBTA facilities." Because the charge is not exacted on all citizens but only those entering the CBD and is tied to an improvement from which they will benefit, it is a toll, not a tax.

Accordingly, plaintiffs have not shown likelihood of success on the merits as to their unauthorized tax claims.

And I now turn to whether the Program constitutes an excessive fine.

Both the Eighth Amendment to the U.S. Constitution and Article 1, Section 5 of the New York Constitution provide that the government shall not impose excessive fines. The analysis under both provisions is the same. *See Wirth v. City of Rochester*, 2021 WL 32705123, at *2 (W.D.N.Y. July 30, 2021). At the first stage, the court determines whether the Excessive Fines Clause applies at all, and if it does, it proceeds to the second step and determines whether the challenged forfeiture is unconstitutionally excessive. *United States v. Viloski*, 814 F.3d 104 and 109.

As to the first step, "the Excessive Fines Clause applies only to protect against punitive, rather than remedial, payments to the government." *Reese v. TBTA*, 91 F.4th 582 and 589, n.2. "A fine may be punitive where it imposes an economic penalty on the person for that person's actions and seeks to deter future wrongdoing." *Polizzi v. County of Schoharie*, 720 F.Supp. 3d 141, 151, (N.D.N.Y. 2014). "The Second Circuit has looked at two factors in order to infer whether an imposition or demand for payment is punishment: One, whether the demand for payment was imposed at the culmination of a criminal proceeding that required a conviction of the underlying felony

and could not have been imposed upon an innocent party; and, two, the nature of the statute that authorizes the demand for payment." *Beatty v.* Gilman, 718 F.Supp. 3d 166, 185 (District of Connecticut 2024).

Here, it cannot be said that the toll is a fine, meaning to punish the individual. *See Rojas v. TBTA*, 2022 WL 748457, at *5, (S.D.N.Y. March 10, 2024) affirmed 91 F.4th 582. Unlike *Rojas*, where the fee was imposed to punish the wrongdoing of using a bridge or tunnel without paying the toll, here there is no wrongdoing that the toll is intended to punish or deter. Rockland argues at page 12 of its brief that the toll is a fine because it is intended to deter people from driving into the CBD. But a fine is punitive if meant to deter future wrongdoing, not if it is simply meant to deter conduct that the government wishes to discourage, but which, like driving in the CBD, is not wrongful. Accordingly, the fact that the toll might discourage people from driving into the CBD, does not make it a fine. Governments take actions to encourage or discourage behavior all the time. People may be deterred from driving to the airport because parking there is so expensive compared to public transit, but nobody thinks the parking fees are fines. The congestion pricing program serves the remedial purpose of reducing vehicle congestion and raising revenue to improve public transit. See de Cerreño declaration paragraph 1. It does not make driving into the CBD a

punishable offense. In fact, the Program's success necessarily depends on some people continuing to drive into the CBD so that defendants can raise money for their mass transit projects. Finally, it applies to all drivers who enter the CBD without a criminal or even civil proceeding or conviction, and the legislation authorizing congestion pricing is civil and quite clear that it is a toll, not a penalty. For instance, VTL 1704-a(1) specifically says the TBTA shall have the power to establish and charge variable tolls and fees for vehicles entering or remaining in the CBD at any time, 1704(3)(a) discusses the CBD tolling infrastructure.

Because the purpose of the toll is not "to encourage compliance with the law and to punish those who fail to comply," *Retail Properties*, 2024 WL 4664644, at *7, the toll is not a fine.

Even if the Program outlawed driving in the CBD and thus the toll were a fine, I doubt it would be unconstitutionally excessive. The fine violates the Excessive Fines Clause if it's grossly disproportional to the gravity of the offense. *See Retail Properties* at *7 and *Viloski*, 814 F.3d at 110. Courts consider the following factors: "One, the essence of the crime of the defendant and its relation to other criminal activity; two, whether the defendant fits into the class of persons for whom the statute was principally designed; three, the maximum sentence and fine that could have been

imposed; and, four, the nature of the harm caused by the defendant's conduct." *Viloski* at 110. All passenger vehicles that enter the CBD will be charged $9. See paragraph 7 of the de Cerreño declaration. Although the act of entering the CBD, were it to be outlawed, would certainly be less severe than much other activity for which a fine might be imposed, the harm caused by traffic congestion is clear: "Economic and environmental costs to businesses, residents, commuters, workers, and visitors." That's defendants' brief at page 7. A charge of $9 is not grossly disproportional in light of these harms and is in line with fines that other courts have upheld for comparable offenses. *See Rojas* at *11, finding an average fine of $18 and change for failing to pay tolls is not grossly disproportionate, *cf O'Diah v. TBTA*, 2021 WL 2581446, at *5-7 (S.D.N.Y. June 13, 2021), which found that fines for failing to pay tolls of $100 each time resulting in $56,000 in total fines, which was roughly 11 times greater than the total of the underlying tolls evaded was grossly disproportionate. Indeed, a simple trespass offense under New York law carries a maximum fine of $250,000, see New York Penal Law, sections 80.05 subsection 4 and 140.05, so if it were unlawful to enter the CBD, a $9 fine with not be excessive. The drivers who accidentally enter the CBD will be charged a full toll does not render the otherwise appropriate charge grossly disproportional. *See Rojas*, 2022 WL 748457, at *9-11, which

noted that the fine was not grossly disproportional even though the plaintiff did not intend to evade the toll. But this is a thought exercise because I need not decide the issue definitively given that the toll is not a fine.

Accordingly, Rockland has not shown likelihood of success on the merits as to its excessive fine claim.

And in sum, plaintiffs have failed to show likelihood of success on the merits as any of their claims. But in an excess of caution, I'll address the issue of irreparable harm, which is "the linchpin of the court's determination of whether a preliminary injunction is available." *Levy v. Young Adult Institute*, 2015 WL 170442, at *4 (S.D.N.Y. January 13, 2015); *see Faiveley v. Wabtec*, 559 F.3d 110, 118, where the circuit said that a showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. "To satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will such an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River v. Pryor*, 481 F.3d 60, 66, *per curiam*. If an award of money damages can sufficiently compensate the moving party, the court cannot find irreparable injury, and it is the moving party who must present evidence that any alleged injury cannot be rectified by a monetary award. *See*, *e.g.*,

*Shapiro v. Cadman Towers*, 51 F.3d 328, 332; *Grand River* at 66; *IBEW v. Charter*, 277 F.Supp. 3d 356, 363-64 (E.D.N.Y. 2017). "The threat of irreparable injury is a *sine qua non*. If there is no irreparable injury, there could be no preliminary injunction." *American Airlines v. Imhof*, 620 F.Supp 2d 574, 579 (S.D.N.Y. 2009).

Orange argues that its allegations of constitutional violations alone are enough to show irreparable harm. That's in Orange's brief at 12-13. "While the Second Circuit has held that pleading an alleged constitutional violation itself constitutes irreparable harm, the presumption of irreparable harm afforded constitutional claims appears to be impacted by the outcome of the Court's analysis of the likelihood of success on the merits element." *Students for Fair Admissions v. United States Military Academy*, 709 F.Supp 3d 118, 136-137 (S.N.D.Y. 2024) collecting cases. In other words, "the favorable presumption of irreparable harm arises only after a plaintiff has shown a likelihood of success on the merits of the constitutional claim." *Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 390, (E.D.N.Y. 2021). *See Andre Rodney v. Hochul*, 569 F. Supp. 3d 128, at 141-142 (N.D.N.Y. 2021), which said the allegation of the constitutional violation is insufficient to automatically trigger a finding of irreparable harm, but rather the constitutional deprivation must be convincingly shown and the violation must carry noncompensable damages. In *Doe v.*

*Quinnipiac University*, 2017 WL 1206002, at *7, (District of Connecticut March 31, 2017), to the same effect. "Once the court considers and concludes that the likelihood-of-success element has not been met, as it does here, the mere allegation of a constitutional violation is insufficient to establish irreparable harm." *Students for Fair Admissions*, at 137.

Rockland argues that it has nevertheless shown that plaintiffs will suffer irreparable harm because it is not feasible for defendants to refund all toll charges from January 5, 2025, to the date of the final decision and it is unclear whether defendants will have the money to issue the refunds. That's in their brief at 7-8. I disagree. Actually, that may be their reply brief at 7-8. I disagree. First, defendants have shown that it will be feasible for them to refund toll payers if plaintiffs prevail in this action. All eligible vehicles entering the CBD will be charged, and will pay, the applicable toll either through their E-ZPass accounts or by bill in the mail. Regardless of method, the identity of the toll payer and the amount paid will be recorded. If plaintiffs prevail in this action, defendants can refund toll payers based on how they paid the toll, either by crediting E-ZPass accounts, reversing credit charges, or issuing a refund check. This comes from the de Cerreño declaration paragraphs 11 through 13. Rockland argues, relying on anecdotal evidence of consumer complaints about E-ZPass refunds, that the Court

should not rely on defendants' "airy assurances about issuing refunds." That's in their reply at 3-5, which is ECF number 48. But the burden is on plaintiffs, not defendants, to show irreparable harm, and they have not shown that it will be impossible for defendants to comply with a court order for refunds, should plaintiffs secure one. "In view of the relief proposed by the defendants, plaintiffs' claims of impracticality are too weak to support a finding of irreparable injury." *Auto Club of New York v. Port Authority*, 842 F.Supp. 2d 672, 677 (S.D.N.Y. 2012).

I also find unconvincing Rockland's argument that the MTA and TBTA will not have the ability to pay out the refunds. Rockland contends, based on a report by the New York State Comptroller, that defendants will not have the money to refund the toll payers because projected budget gaps for the MTA are in the hundreds of millions and increasing steadily. That's Rockland's brief at 8. But mere speculation about defendants' ability to pay is insufficient to establish irreparable harm. "Irreparable harm may lie in connection with an action for money damages where the claim involves an obligation owed by an insolvent or a party on the brink of insolvency." *CRP/Extell v. Cuomo*, 394 F.App'x 779, 781, summary order, citing *Brenntag International Chemicals v. Bank of India*, 175 F.3d 245, 249-250. "In order to utilize this exception to the general rule that a monetary injury does not constitute irreparable

harm, however, a movant must show that the risk of insolvency is likely and imminent." *Alpha Capital v. Shiftpixy*, 432 F.Supp. 3d 326, 340 (S.D.N.Y. 2020*); see Compass-Charlotte v. Prime Capital*, 2024 WL 260507, *8, (N.D.N.Y. January 24, 2024), collecting cases. Here, neither the TBTA nor the MTA is insolvent, de Cerreño declaration paragraph 14. And the MTA, which has a balanced budget through 2026, is projected to take in the nearly $20 billion in revenue in 2025. Also paragraph 14. That these agencies may have budget gaps does not mean that they will fill them by ignoring court order to make refunds as opposed to another way. I therefore cannot find that defendants are either insolvent, on the brink of insolvency, or otherwise likely to be unable to pay.

Because defendants have "persuasively argued that any harm alleged by plaintiffs can be adequately remedied through a monetary refund," *Auto Club*, 842 F.Supp. 2d 676, the plaintiffs have not shown that they will suffer irreparable harm in the absence of an injunction.

Because I find that plaintiffs have shown neither likelihood of success on the merits nor irreparable harm, I need not consider the remaining factors. *See GEICO v. Mahmood*, 2024 WL 113958, at *7 (E.D.N.Y. January 10, 2024); *Chestnut Hill v. City of Kingston*, 698 F.Supp 3d, 399, 424, (N.D.N.Y. 2023); and *Eastern Computer v. King*, 2022 WL 2527976, at *5 (District of Connecticut July 3, 2022).

I recognize that the congestion pricing program is going to be more costly to some people and some groups than others, and as a policy matter one can debate, as I imagine the legislature did, whether that is fair or wise. But unfair or unwise is not the same as unconstitutional. There are pros and cons of living in Rockland and Orange Counties, as there are with any locality. This is one of the cons, but it does not rise to the level of constitutional deprivation warranting an injunction.

For the foregoing reasons, plaintiffs' motions for a preliminary injunction are denied. The Clerk of Court is directed to terminate the pending motions, which are number 43 on the Rockland docket, and number 37 on the Orange docket.

We now have to talk about next steps.

On November 6th, I set a date for plaintiffs to amend 30 days after the announcement end of pause, and on November 18th I said the 30 days started to run on November 14th. Neither plaintiff has amended. So I guess we are moving directly to motions to dismiss. So we need to set a schedule for that.

You want to make a proposal, Mr. Crema?

MR. CREMA: Yes, your Honor, and thank you.

That aligns with our understanding of the current the status of the case as well. We would recommend, respectfully suggest, that the Court proceed along the schedule we

previously indicated in our November 14th filing, which would have our motion to dismiss due on January 15th, plaintiffs' opposition on February 14th, and then our reply due on February 28th.

THE COURT: That work for plaintiffs?

MR. PARISI: Yes. The previously agreed-upon schedule works.

MR. BADURA: Yes, Judge.

THE COURT: All right. That's the schedule.

Is there anything else we should do this morning? This afternoon, I mean.

MR. CREMA: Nothing from defendants, your Honor.

THE COURT: All right. I always ask if there is any possibility of resolving the case, but I'm not really sure how that would work here. But you folks would know better, and if there is one, and if you think you're going to be able to resolve it and it's just a matter of crossing Ts and dotting Is, and you want to push off the motion schedule, I'm always amenable to that. But unless I hear otherwise, I will look for the motion papers on the schedule we set.

All right. Thank you, all.

Everybody have a nice holiday.

MR. PARISI: Thank you, your Honor.

MR. CREMA: Thank you, your Honor.

o0o